## Case No. 11,117.

### PIATT v. VATTIER et al.

**[1 McLean, 146.]** [1]

Circuit Court, D. Ohio. Dec. Term, 1831. [2]

LIMITATION OF ACTIONS—NON-RESIDENTS—FRAUD
—NOTICE.

1. The statute of limitations of 1804 was repealed by the act of 1810. This act was repealed by the act of 1824—no provision in this act where the former statutes had begun to run—this was remedied by the act of 1826.

2. A statute of limitations cannot bar for lapse of time before its passage; but if a reasonable part of the time fixed for the limitation has to run, at the time the statute is enacted, it will operate.

[Cited in Johnson v. Bond, Case No. 7,374; Campbell v. Holt, 115 U. S. 632, 6 Sup. Ct. 215.]

[Cited in Price v. Hopkin, 13 Mich. 325, 328; Pritchard v. Spencer, 2 Ind. 486.]

3. The statute of Ohio does not operate against non-residents of the state.

[Cited in Bowman v. Wathen, Case No. 1,-740.]

4. Lapse of time may be applied, under proper circumstances, to bar an equity, where the statute would not bar.

[See Reed v. Dingess, 56 Fed. 175.]

5. This rule is applied by a court of chancery, on its own principles, which do not depend upon the statute of limitations.

[See Reed v. Dingess, 56 Fed. 175.]

6. The statute will operate even where there has been fraud, from the time the fraud is discovered.

[Cited in Parks v. Satterthwaite, 132 Ind. 413, 32 N. E. 82.]

7. Mere rumor is not sufficient notice.

8. Where notice is denied in the answer, it must be proved by more than one witness.

9. Notice to a purchaser, who purchased from a bona fide purchaser, without notice, cannot affect the title.

[This was a bill in equity by Robert Piatt against Charles Vattier and others and the Bank of the United States to secure title to a certain lot.]

Mr. Scott, for complainant.

Mr. Starr, for defendants.

OPINION OF THE COURT. This suit is prosecuted by the complainant, for the title to lot number one, on the town plat of Cincinnati. He alleges that this lot, with several others, was given as a donation, on condition that the donee within a limited time should construct a house of certain dimensions. That the proprietors gave a certificate of this right, which was transferable by assignment. That the above lot was allotted to one Samuel Blackburn, who transferred his right to one James Campbell, and he to one John Bartle, under whom the complainant claims by deed dated 22d June, 1827; that in the summer of the year

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

[2] [Affirmed in 9 Pet. (34 U. S.) 405.]

1790 Bartle took possession of the lot, and made the improvement required within the time limited. That he occupied the building first by himself, and then by his tenants Elliott and Williams; also by Abijah Hunt, for several years. The complainant further states, that the said Bartle, becoming embarrassed in his circumstances, mortgaged the lot to one Robert Barr, of Lexington, Kentucky, for the sum of about seven hundred dollars, to the payment of which the rents reserved to the said Bartle from the tenants in possession were to be, and a large amount was in fact, paid. That Bartle lost the certificate for the lot in crossing the Ohio river, and that the defendant, Vattier, coming to the knowledge of this loss, fraudulently purchased Barr's right to the lot, which had become very valuable, and obtained possession of it. And that the said Vattier obtained fraudulently from John C. Symmes, who held the legal title, a conveyance for said lot. That Vattier sold the same to John Smith, who had full notice of Bartle's claim. That Smith transferred the lot to John H. Piatt, who also had full notice of Bartle's claim. Piatt, now deceased, in his life-time, mortgaged the lot to the United States Bank, to whom the equity of redemption has been relinquished. That the agents of the bank had full notice of Bartle's interest before the mortgage was executed. That, though Bartle asserted to the respective purchasers of the lot his right, he was unable, by reason of his poverty, to sue for its recovery. The complainant prays that the bank may be decreed to deliver up possession of the lot to him, and execute a quit claim deed for the same; and that it may be compelled to account for the rents and profits, &c. That if the title of the bank be held good, the defendant Vattier may be decreed to pay the value of the lot, &c.

In the answer, the bank admits that Vattier obtained a deed for the lot in controversy in 1799, and entered into the possession of it; and continued to occupy it until he sold to Smith, who possessed the property for some years. That it was purchased by John H. Piatt, and by him mortgaged to the bank, to secure the payment of a large sum of money. That afterwards the equity of redemption was relinquished by the representatives of Piatt. All notice is denied, and also the allegation of fraud.

Vattier, in his answer, denies expressly that Bartle ever mortgaged the lot to Barr, and avers that he never heard of such a mortgage until after the commencement of this suit. No such instrument is found on record. He understood that Bartle had been in possession of the lot in conjunction with another individual, and that they had made some improvements on it, but to what extent, or what was the nature of their claim, or how long they lived on it, he never knew. He denies that Bartle ever had the donation

right. Being desirous of purchasing the lot, he was informed, on enquiry, that Barr was the owner, by Jesse Hunt and Ludlow, one of the original proprietors of the town. He understood there was some dispute between Barr and Symmes respecting the lot. That he went to Lexington, saw Symmes and Barr together, and there purchased the lot of Barr for seven hundred and twenty-five dollars, which sum was paid by him. Symmes gave him a writing, obligating himself to make a deed for the lot on his return to Cincinnati. The dispute between Barr and Symmes was, at this time, adjusted. When the purchase was made, he received no writing from Barr as evidence of title. He understood that the legal title was in Symmes. He took possession of the lot after he obtained the deed, and continued to occupy it about nine years, when he sold and conveyed it to John Smith, in the year 1806. That in obtaining possession of the lot he used no fraud; it was voluntarily surrendered to him by the person in possession of it, and he denies any knowledge whatever of the equitable claim of Bartle, either at the time he made the purchase or took possession. That although he frequently saw Bartle, he never made known to the defendant any claim to the property. He was frequently in the house while it was occupied by the defendant. He denies that Smith had any notice, and avers that since 1797 there has been an uninterrupted possession under the deed from Symmes.

From the evidence, it appears that, in 1799, Bartle and one Strong, in Cincinnati, were connected in business, and kept a tavern in one part of the house, on the lot in controversy, and a store was kept in the other part. There was a rumor that Bartle and Strong, having bought goods of Barr, mortgaged the house and lot to him to secure the payment of the debt. Shortly after, Strong died in the house, and in June or July, 1792, Bartle left Cincinnati and resided in Kentucky; and Barr came into the possession of the lot, and had the whole under his charge. Bartle became embarrassed, was unable to pay Barr, and he took possession of the lot, received the rents, claimed the property, whether absolutely or not does not appear, until he sold it to Vattier. Vattier obtained the deed from Symmes, in whom the legal title was vested, to whom he paid fifteen pounds. The lot was originally a donation lot, and Bartle and Strong purchased it, and built the first house upon it. Blackburn seems to have been the donee of the lot, and he sold it to one Campbell, of whom Bartle and Strong purchased in 1789 or 1790. It was the practice to give the original donee a certificate, which was transferable. Some time after, Vattier purchased and came into possession; he had notice of some claim that Bartle had on the lot, but the former remarked he did not regard it, as he had a deed for the lot. Some of the witnesses say that Campbell was connected with

Strong and Bartle in business, but that he left Cincinnati some time before Strong died, and the business was carried on in the name of Strong and Bartle. Bartle, it seems, lost the donation certificate for the lot. When the lot was owned by Piatt, one of the witnesses states that he was requested by Bartle to communicate to Piatt that if he would pay up all rent on the lot from the time the mortgage was paid off up to that time, which was in 1817, he would relinquish all claim to the lot; which Piatt refused to do. The deed from Symmes to Vattier bears date the 20th of March, 1797. Smith's deed from Vattier is dated 9th July, 1806. The sheriff's deed to Piatt bears date 17th August, 1812, and the mortgage from Piatt to the bank is dated 13th October, 1820.

An objection is made in the argument that the necessary parties are not before the court. It is alleged that Bartle and the representatives of Symmes are necessary parties, and the decision of the supreme court in the case of Findlay v. Hinde [1 Pet. (26 U. S.) 241], is referred to as in point; and also the decision of this court in the case of Smith v. Shane [Case No. 13,105]. In the first case, the supreme court decided that Garrison was a necessary party, although he had conveyed the property to one of the defendants, on the ground that the complainants could recover only by force of the equity set up against Garrison, and that an opportunity should be afforded him, by making him a party, to rebut that equity. In the case of Smith v. Shane [supra], the complainant set up an equity as against Buford, though he had conveyed to the defendant, Shane, and the court decided, under the authority of the above case, that Buford was a necessary party. But in the case under consideration, Bartle has conveyed his interest by deed to the complainant, and he only sets up the interest thus derived. For what purpose, then, is it necessary to make Bartle a party? Whatever right he had in the premises passed to the complainant, not by an executory but an executed contract. Claiming under a deed which, without conditions, transferred to the complainant the right of the grantor, the sanction of a court of equity cannot be necessary to perfect the title of the complainant as against Bartle; nor can he claim a right to invalidate the deed because the consideration has not been paid. The deed imports a consideration.

The authorities referred to do not sustain the objection as to Bartle. It appears from the facts in the case that Symmes held the title as a naked trustee, and having conveyed it, no right or interest in the premises could devolve upon his heirs, nor can they be held responsible in any point of view, under the circumstances of the case. The necessity, therefore, of making them parties to the suit is not perceived. Whether Campbell and Strong have an interest in the premises, so as to require them to be made parties to the

suit, depends upon the proof in the case. The complainant only asserts the right of Bartle, and unless he shall show a transfer of whatever interest both Campbell and Strong had in the premises, he must fail in his suit. It is admitted that the donation of the lot was made to Blackburn, and it is alleged that Campbell purchased his right. From the proof, it appears that a certificate from the proprietors was the evidence of right held by the donee, and that this certificate was transferable either by assignment or delivery, but which does not satisfactorily appear. There is no proof of any assignment having been made of the certificate held by Blackburn, if indeed he held any such evidence of title. It does not appear, from any competent proof, that a certificate was ever issued for the lot in controversy. If the mere statement of Bartle, that he had lost the certificate which he held for this lot, be sufficient to prove his loss, it cannot be received as evidence of the contents of the paper. Jacob Fowler, one of the witnesses states, that he heard Israel Ludlow, one of the proprietors, and who acted for the other two proprietors, say, that lot number one belonged to James Campbell, and he knows that in the summer of 1790, Campbell, Bartle, and Strong, erected a building on the lot, which satisfied the terms of the donation. The same summer the building was completed, and those three individuals occupied it, and were connected in the business of merchants. Campbell left the firm in a short time, and then the firm was known by the name of Bartle and Strong. Some time afterwards Strong died in the house, and in a few months Bartle left Cincinnati. About this time Campbell informed the witness, Fowler, that he had sold the house and lot to Bartle. This declaration of Ludlow as to Campbell's right, and the admission of Campbell that he had sold the property to Bartle, are the only facts, except common report and the circumstances of the case, which show the derivation of title by Bartle. What evidence of title was given by Blackburn to Campbell does not appear, nor how he conveyed to Bartle. From the statement of Hunt, it appears that Strong was interested with Campbell and Bartle in the property, and assisted in its improvement. How his interest has been disposed of, does not appear. There is no proof conducing to show that it was purchased by Bartle, unless the fact of his remaining in possession of the property, after the decease of Strong, and the acknowledgment of Campbell that he had sold the lot to Bartle, authorize such an inference.

If the above transactions were of recent occurrence, would not proof of the transfer of Strong's right be necessary to authorize a divesture of the legal title from the defendants. If the proof of his right were as clear as that of Bartle's in the first instance, which is believed to be the case, a court of chancery would require some evidence of the trans-

fer of that right before it would invest Bartle with the full legal title. This evidence is not found in the fact of the possession of the lot by Bartle a few months subsequent to the decease of Strong, or in the circumstances that followed. Nor is it satisfactorily found in common report. This may be evidence as to the boundaries of land, or to establish the genealogy of heirs. But if the proof of the transfer of the right from Campbell and Strong to Bartle, were indisputable, as that transfer is not pretended to have been made by deed, as is done by Bartle to the complainant, would it not be necessary to make the heirs of Strong parties, and also Campbell, that they might rebut the equitable claim to their interest, as set up by the complainant. If, as to Campbell, the existence of the certificate be presumed, and that the property was transferred to Bartle on the delivery of this certificate from Campbell, yet the interest of Strong's heirs seems not to have been conveyed. Should the court presume against the evidence of Hunt, Fowler and White, that Strong had no interest in the premises, and that Bartle's right covered the whole property, still there are objections to the complainant's title, which it would become important to consider. The claim of Barr originated under a mortgage, as contended by the complainant, to secure the payment of a bona fide debt of between six and eight hundred dollars. And the complainant presents himself as invested with Bartle's equity and as having a right to redeem the title from the lien of the mortgage. If any mortgage were executed from Bartle to Barr, it could only have been an equitable mortgage, as the legal title was never in Bartle. At what time this mortgage was dated, if it ever had any existence, does not appear, nor whether it was executed by Bartle and Strong, or by Bartle only. Hunt understood that Bartle or Strong mortgaged the property to Barr, and this witness seems to have had as accurate a knowledge of the circumstances of the case, as any other one examined. No witness ever saw the mortgage, and whether it existed in parol or in writing, does not appear. Nor are the conditions of the mortgage shown by proof.

From the facts established, it is to be presumed that the debt to Barr being for goods, was due from Bartle and Strong, as they sold goods as partners, and the business was continued by Bartle only a few months after the decease of Strong. It is probable the mortgage was given in the summer of 1792, and that Barr came into the possession of the property either in that or the following year. If the property were mortgaged with the understanding that the annual rent should be applied to the payment of the mortgage so soon as it was discharged, the right would revert to the mortgagor. It is to be regretted that an agreement so important to the rights of the parties as this, should not have been committed to writing, or preserved in the memory of witnesses. Mr. Fowler, the witness, seems

to have derived his knowledge on this point from Bartle, and the tenants of Elliott and Williams, who rented the lot or a part of it. They stated to him the amount of the rent annually, and that it was to be applied to the payment of the mortgage. Mr. Hunt states, that Abijah Hunt had the agency of the lot for Barr, until about the time that Vattier purchased it, and that the agent accounted to Barr for the rent. And the witness seems to have no doubt that the annual rent was paid to Barr in discharge of the mortgage. This is an inference which he draws from the facts and circumstances of the case; for he does not pretend to state the fact of payment as coming within his own knowledge. If this impression were received by communications made to him by the agent of Barr, it is not competent testimony; nor is it more competent if it be an inference from the facts disclosed in his deposition. The receipt of the rent by Barr was consistent with the ownership of the property, which seems to have been asserted by him in his offering to sell it, and, at last, in his actually selling it. White understood that the property passed into the hands of Barr by virtue of a mortgage, or some other agreement; and Hunt says that Barr being unable to obtain the payment of his claim against Bartle, took possession of the property to secure his debt, though the witness does not think he claimed the absolute title to it. As these transactions took place nearly forty years ago, and as they are only evidenced by the frail recollection of witnesses, it is not extraordinary that they are vaguely stated. After so great a lapse of time, it is not to be expected that witnesses can discriminate very accurately between facts which came within their own observation, and those which they received from others.

No aid is given to this part of the complainant's case, by the answers of the defendants. They deny the material allegations in most parts of the bill, and require strict proof of every part of it. No fact has been proved going to show that either Barr, while he was in possession of the property, or those who subsequently claimed it, ever admitted Bartle's right. No one seems to have seen the mortgage, or was present when it was executed. No one proves the existence of the mortgage or its contents, as coming from Barr. The facts stated by the witnesses in relation to this lien, seem to rest on floating rumors, and on statements made by Bartle and his tenants, and perhaps the agent of Barr. In the leading circumstances of the case, there is but little found to relieve the mind from this state of uncertainty in regard to the foundation of the complainant's claim; for the legal title being in his adversary, a divesture of it can only be decreed by the clear exhibition of a paramount equity. A legal title, sanctioned by a long and uninterrupted possession, cannot easily be shaken. The better right, under such circumstances, must be proved so fully as to leave no ground for serious doubts, before chancery will divest the legal interest. But, if the mortgage were clearly established, and the mortgagee, having entered into the possession of the premises, may be compelled to account for the rents received, after deducting the money expended in judiciously improving the property, still there are serious objections to be overcome before the title of the complainant could be sustained. The statute of limitations and the presumption against his title from lapse of time, have both been insisted on in the argument. Indeed, on these two grounds, the defendant's counsel principally rely for their protection. The first statute of limitations in this state was passed in January, 1804, and took effect the 1st May following, and it takes away the right of action by ejectment for the recovery of real estate, where an uninterrupted possession has been held adversely for twenty years. But there is a saving in behalf of femes covert, infants and persons beyond seas. Bartle, it is contended, being a citizen of Kentucky, is within the saving beyond seas. The bill was filed the 6th December, 1827. By the act of 1810, the above act of the 1st January, 1804, was repealed, but its provisions, except twenty-one years were inserted in lieu of twenty years, were substantially embodied in the repealing act, and it contained a special provision for cases where the previous statute had begun to run. On the 25th February, 1824, the above act of 1810 was repealed, but the same limitation was continued, and it was provided that actions barred under former statutes should not be maintainable, but there was no provision respecting cases where the previous statutes had begun to run. This act took effect the 1st June, 1824. By an act of 1826, the previous acts of 1824 and 1810 were revived in all cases where they had begun to operate. As the act of 1824 repealed all former acts of limitation with a saving only in cases where the full term of a previous statute had run, it follows that, unless the defendants can bring their case within the provisions of this statute, or the resuscitating act of 1826, the bar set up under the statute cannot be sustained. The statute of 1804 took effect the 1st of May, and that of 1824 the 1st of June, so that there was one month more than the twenty years limitation fixed by the act of 1804, before it was repealed by the act of 1824. Unless, therefore, the statute began to run against the claim asserted by the complainant within one month from the time the act of 1824 passed, it creates no bar unless aided by the statute of 1826. When the act of 1804 was passed, Bartle, it seems, was a resident of Kentucky, or at least he was not a resident of the state of Ohio. Being a non-resident, he comes within the saving of the statute as to persons beyond seas, unless he came within the state, which would subject him to the operation of the statute. The time which had

elapsed previous to the taking effect of this statute, could form no part of the twenty years required under it to bar an action.

On a careful examination of the proof in this case, it does not appear that Bartle was in Cincinnati, or in any other part of the state, at any time within the month of May, 1804. Since Vattier's purchase and possession of the property, it seems, from the statement of Mr. White, one of the witnesses, he was several times in Cincinnati, but from so general a statement, the fact cannot be inferred that he was in Cincinnati in the month of May. The only time that Bartle is proved, specifically, to have been in Cincinnati was, after the purchase of the lot by Smith, and while he was digging the cellar for the building he erected on the lot. Within what month or even year, this cellar was dug, does not clearly appear. It must, probably, have been subsequent to the 9th of July, 1806, as that is the date of Smith's deed from Vattier. No witness specifies the time the above improvement was commenced. It may have been commenced in 1806, 7 or 8. If the time above referred to, at which Bartle was within the state be less than twenty years preceding the commencement of this suit, the statute does not bar. The bill was filed on the 6th day of December, 1827; consequently if the time referred to was not anterior to the 6th December, 1807, the statute cannot operate against the title of the complainant. If the statute of 1804 had begun to run by Bartle's coming into the state, so that the twenty years expired before the act of 1826 took effect, that act could not constitute a bar. By the act of 1824, the previous act of 1810 was repealed, and no subsequent statute could so revive the act of 1810, and the previous one of 1804, as to give them the same effect in every respect as if they had not been repealed. In 1826, when the resuscitating act was passed, the statutes of 1810 and 1804 had no existence, and could have no effect, except as to causes of actions which had become barred under them. If the action was accrued, so that the time of the statute was completed between the time the act of 1810 was repealed, and the passage of the resuscitating act of 1826, the latter statute could not operate. To give effect to its provisions in this respect, would recognize a power in the legislature to bar an action, by a provision entirely retrospective in its operation. It would scarcely be contended that it would be in the power of the legislature to prevent, by special provision, the prosecution of any action for the recovery of a right where the limitation had expired before the passage of the act. Such acts must be prospective, although the time within which suit must be brought, may be limited by legislative discretion. If, when the act of 1826 took effect, a part only of the statutes revived had run, it might well be enforced. For effect could be given to it, under the circumstances of the case; and the time the statutes of 1804

or 1810 had to run would be the limitation imposed by the act of 1826. But in all cases where limitation had run before the passage of the act of revivor, no effect whatever can be given to it. In this view of the statutes, and on a failure of proof to show that the statute of 1804 began to operate on the title of Bartle in the month of May, 1804, it is essential for the defendants to show that the same act began to run at a time which would fix the expiration of the limitation of twenty years, a reasonable time after the act of 1826 took effect. As before remarked, if Bartle was not within the state before the 6th December, 1807, which was twenty years preceding the filing of the bill, the plea of the statute cannot avail the defendants; nor can it avail them, according to the construction given to the above statutes, if they show the statute did begin to operate prior to the above day, unless they fix the time within less than twenty years preceding the act of 1826. This limits the period within which the defendants must show that Bartle was within the state from a reasonable time, tor the operation of the statute after the 8th February, 1806, to the 6th December, 1807. This reasonable time must be the limitation imposed by the act of 1826, connected with the act revived, and applicable to cases like the present. It may not be necessary for the court to determine on the reasonableness of the time, unless the proof shall show that Bartle was in the state within the period specified. The time being fixed, the enquiry remains as to the fact, when did the statute begin to operate against the title of Bartle. He was within the state while Smith was digging the cellar on the lot in controversy, or was about to commence digging it. At what time was this? The witnesses do not specify the date. It was, probably, as before remarked, subsequent to the 9th July, 1806, but was it anterior to the 6th December, 1807.

In the argument, a reference was made to the motion for the expulsion of Smith from the senate of the United States, connected with other circumstances, as fixing the time the above improvement was commenced. It appears from the statement of the witness that Smith was in Cincinnati when Bartle was present and the cellar was being dug; but whether this was before or after the motion referred to does not appear. On a fact so material as this, it is somewhat extraordinary that the evidence is so indefinite. The time this cellar was dug, it would seem probable might be shown by the testimony of living witnesses. But the witnesses called to testify have been unable to fix the time with precision, or they have not been examined as to the fact. It is incumbent on the defendants to fix the time the statute began to operate, in order to entitle themselves to its provisions. A fact so important cannot be inferred from slight circumstances, nor can it be established on doubtful testimony. As

it has not been proved that the statute began to operate within the time specified so as to constitute a bar to the plaintiff's title, it · is unnecessary to consider the other grounds assumed in the argument against the operation of the statute. It may be remarked, however, that, even in cases of fraud the statute will begin to run from the time the fraud is discovered. And in such a ·case the policy of the statute is as clearly in favor of its operation as under any other circumstances.

If it be important in ordinary cases, that the facts should be investigated and the controversy settled within the limitation fixed by the statute; it is not less so, when fraud has been committed, that facts which constitute the fraud should be investigated while they remain in the recollection of witnesses. The lapse of time insisted on by the defendants' counsel remains to be considered. On this ground most reliance was placed in the argument. On the part of the complainant, it is contended that lapse of time cannot operate against the title he sets up, because Bartle was not a citizen of the state, and lapse of time can only operate in cases where the statute of limitations applies: and because Vattier was a purchaser with notice and was guilty of fraud in procuring the legal title; and that each purchaser, down to the present owners had notice of Bartle's claim. It is a well-settled principle, that effect will be given to the statute of limitations in equity the same as at law. At first this rule was controverted and afterwards frequently evaded, on the ground of implied trusts, but the modern decisions have sustained the principles as above stated.

The position assumed by the complainant's counsel, that lapse of time can only operate where the statute applies. is not sustained by authority. "At all times courts of equity, have, upon general principles of their own, even where there was no statutable bar. refused relief to stale demands, where the party has slept upon his rights and acquiesced for a great length of time." This doctrine is fully sustained in the case of the Marquis of Cholmondeley v. Lord Clinton, 2 Jac. & W. 1, ·138–152. In the case of Townshend v. Townshend, 1 Brown, Ch. 551, the court, on possession of thirty years by the defendants. presumed that the settlement under which the complainant claimed was voluntary and dismissed the bill. And in the case of Andrew v. Wrigley, 4 Brown, Ch. 125, where an executor had sold the testator's term specifically devised, under strong circumstances of fraud, Lord Thurlow refused relief from the lapse of time, although his decision would have been different if an earlier application had been made. The same principle was acted on in the case of Morse v. Royal, 12 Ves. 373, and also in the case of Beckford v. Wade, 17 Ves. · 87. Lord Kenyon in this last case says, "Courts of equity by their own rules independently of any statutes of lim-

itation, give great effect to length of time, and they refer frequently to the statutes of limitation for no other purpose than as furnishing a convenient measure for the length of time that ought to operate as a bar in equity to any particular demand." Smith v. Clay, 3 Brown. Ch. 640; note Bond v. Hopkins, 1 Schoales & L. 413, 428; Stackhouse v. Barnston, 10 Ves. 466, 467; Kane v. Bloodgood, 7 Johns. Ch. 93. In the case of Bonney v. Ridgard, 1 Cox, Ch. 145, relief was refused from the lapse of time, though from the face of the assignment, fraud was apparent. And in a later case of Blennerhassett v. Day, 2 Ball & B., 104, it was decided that, "where the facts constituting fraud, are in the knowledge of the party, and he lies for nearly twenty-five years, he cannot get relief." This doctrine is illustrated with consummate ability by that distinguished judge, Lord Reddesdale, in the case of Hovenden v. Lord Annesley, 2 Schoales & L. 608. And in the case of Gregory v. Gregory, Coop. 201, "where the time was only eighteen years and the case on the merits favorable for relief, yet it was refused."

The supreme court have decided in [Hughes v. Edwards] 9 Wheat. [22 U. S.] 489, that "where no interest has been paid, and the mortgagee has been in possession of the mortgaged premises for twenty years, and no special circumstances being shown, the mortgagor is barred from the equity of redemption." And so where the mortgagor has remained in possession for the same term, without the payment of interest or an acknowledgment that the mortgage is still existing, he may rely on the lapse of time against a bill to foreclose, and the court will presume the money paid. It will be perceived, from these cases, that the lapse of time, connected with an adverse possession, which may close the door of a court of equity, does not necessarily depend upon a statute of limitation. In the state of Tennessee, the limitation within which the action of ejectment must be brought is five years, and in Kentucky seven. Would it be contended that, by analogy to these statutes, a title might be presumed where an uninterrupted adverse possession had been proved for the terms · specified? Such a presumption arises under the common law, in many cases, after the lapse of twenty years, and, under peculiar circumstances in a shorter period.

Vattier procured a deed for the lot, and entered into possession of it, in 1797. Previous to this purchase, for some years, it had been in the possession of Barr. In his answer Vattier denies that he had any knowledge of Bartle's claim. He states that he never heard of the mortgage until after the commencement of this suit. Are these allegations of the answer contradicted by two witnesses, or by one witness and strong circumstances? Fowler, one of the witnesses, states that, on his asking Vattier what he would do with Bartle's claim, a

short time after he made the purchase, he replied that he had examined and found that Bartle had no deed for the house and lot, on which he went to Lexington, and purchased Barr's claim. This is the only witness that proves that Vattier had any notice of Bartle's claim before the purchase was made. It seems the house was called Bartle's, either on account of his claim to the property, or from the circumstances of its having been built by him and others. Perhaps from a floating rumor of his right, Vattier may have been induced to make the examination he did make to see if Bartle had any title to the premises. He found nothing to show a color of title in Bartle. Nor does it seem that he could have been successful in ascertaining the nature of this title as set up by the complainant, except by application to Bartle himself or to Barr. He did apply to Barr, and purchased the property from him at its full value. There is no pretence that Vattier did not pay an adequate consideration for this lot. What kind of notice will affect the conscience of the purchaser? Floating rumor is not sufficient, nor a notice by one who has no interest in the property. 1 Story, Eq. Jur. 389; Jolland v. Stainbridge, 3 Ves. 478; Sugd. Vend. c. 17. But if the statements of this witness were sufficiently explicit to show a notice of Bartle's title, still it is but one witness in contradiction of the answer. If the notice be not established, the circumstances of Vattier's obtaining the deed from Symmes does not show fraud. Aside from the motive, the obtainment of the deed was an act done in good faith. Symmes compelled him to pay fifteen pounds under the pretence that that sum was due from Bartle for the lot. If Symmes acted fairly in this transaction, the payment of this money goes strongly to refute the fact insisted on, by the complainant, that this was a donation lot. But if Symmes acted unfairly in exacting this sum, it affords no presumption against Vattier; for he might have preferred paying the sum to a legal controversy. It seems he received no written evidence of title from Barr, but Symmes gave him an obligation for the deed. Some of the witnesses refer to a controversy between Barr and Symmes respecting the title; and it seems this controversy was adjusted at the time of Vattier's purchase. If Vattier could be considered as a purchaser without notice, the title to the subsequent purchasers is not affected by any notice, though clearly proved. The sufficiency of the notice, as proved against Smith, Piatt and the bank is denied.

Without going into a special investigation of the facts in regard to these notices, or of the principles of law which apply, we feel ourselves required to consider the question of lapse of time, connected with all the circumstances of the case. In 1792 or 1793, Barr took possession of this lot. He was succeeded by Vattier in 1797, whose possession was clearly adverse as has been the possession and claim of every subsequent holder of the property, down to this day. Bartle resided in Newport, Kentucky, for several years, within full view of the property. This residence might shield him from the operation of the statute so long as he remained without the limits of Ohio. But does it afford an equal protection against the lapse of time, in the point of view under consideration. Shall the same importance be given to a mathematical line in one case as in the other? This statute can only operate within the limits of the sovereignty as construed by the courts; consequently, it cannot affect the interest of one who is beyond seas, or without the limits of the sovereignty. The legislature have undoubtedly the power to bar the rights of non-residents in the tribunals of the state, but they have not done so in the statute referred to. Lapse of time when considered as a rule in equity, rests upon a different principle. It is not founded upon statutory provisions, though the statute of limitations may be referred to as fixing a reasonable time for its operation. The rule is applied, by the courts, on a broad view of all the circumstances of the case. It does not depend upon an arbitrary exercise of power by the court; but like other principles, it must be applied to the facts of the case, as they may be found in the judgment of the court. If the rule be varied, it is because the circumstances of the case are different. Under some circumstances, an uninterrupted adverse possession for twenty or a less number of years, may afford as strong presumption of title as a much longer period under different circumstances. From the time Bartle relinquished the possession of this property, in 1792 or 1793, he has not assumed to exercise any acts of ownership over it, or made claim of title except in one instance, when Smith was about digging his cellar; and in another, when a proposition was made to Piatt to relinquish the title, if a certain amount of rent was paid. Here is a lapse of time exceeding thirty years, during which time great improvements were made on the property. Its value is greatly enhanced. It has been transmitted through various hands. Still the claim of Bartle remains dormant. He lives in view of the property, or at most, within a few miles of it. Whether this distance of a few hundred yards or a few miles, be in a direction out of the state or in it, cannot be material. He is poor, but does this exempt him from the use of ordinary vigilance? Does the law fix one rule for the rich and another for the poor? Poverty is a circumstance, and, sometimes a misfortune, but it cannot alter the rule of property. Could Bartle have been ignorant that Vattier claimed the property? His possession, his acts of ownership, the record of his title, evi-

denced to the world his claim to the property. This property, worth about six or eight hundred dollars when Bartle relinquished it, is now, with its improvements, worth seventy or eighty thousand dollars. Has not Bartle slept upon his rights. In failing for so great a length of time to adopt any means for the legal adjustment of his claim, has he not acquiesced in the adverse claims accompanied with possession.

If the equity set up by the complainant were to be sustained, and not only the title to the property decreed to him, as prayed in his bill, but the rents and profits, would not the principle shake the security of titles to real estate? There would be ground of alarm to holders of such property that some slumbering equity, which had not seen the light for many years, but about which rumors may have been circulated, might be exhibited to the destruction of their title. In no sense could Vattier be considered as the tenant of Bartle. His legal title was adverse from its commencement. He never acknowledged Bartle's title in any form. If he had even entered as his tenant, under the decision of the supreme court in Willison v. Watkins, 3 Pet. [28 U. S.] 44, the assertion of his own right to the property, and a denial by himself and those who claim under him, of the right of Bartle, would give him or them the benefit of the statute of limitations, by proving that Bartle had come within the state.

On the view of the case we have taken, looking at the doubt and uncertainty of the equity set up, at the lapse of time, connected with all the facts of the case, a sense of duty compels us to say that the complainant has failed to establish an equity which would authorize us to vest in him the legal title. The statute would bar the special relief prayed against Vattier. The bill must be dismissed at the costs of the complainant.

This case was taken by appeal to the supreme court, where this decree was affirmed. 9 Pet. [34 U. S.] 405.